UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　　Plaintiff,<br>　v.<br>QUARSIE KAREEM JACOBS,<br>　　　　　　　　　　　Defendant. | Case No. 2:18-cr-00394-JCM-PAL<br><br>ORDER<br><br>(Mot Suppress – ECF No. 21) |

Before the court is defendant Quarsie Kareem Jacobs' ("Jacobs") Motion to Suppress which (ECF No. 21) was referred to the undersigned for a report of findings and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice. The court has considered the motion, defendant's Notice of Manual Filing with attached disc (ECF No. 22), the government's Response (ECF No. 23), Jacobs' Reply (ECF No. 25), the testimony adduced at an evidentiary hearing conducted February 12, 2019, and a transcript of the hearing filed March 4, 2019. Linda Mott appeared on behalf of the government, and Erin Gettel appeared on behalf of defendant Jacobs.

In the Minute Order setting this matter for hearing, the court directed both sides to address the Ninth Circuit's recent decision in *United States v. Johnson*, 913 F.3d 793 (9th Cir. 2019), which was issued after the motion to suppress was filed. The court has considered Jacobs' Supplement to Motion to Suppress (ECF No. 30). The government did not file a response to Jacob's supplement.

## BACKGROUND

### I.    The Indictment

Jacobs is charged in an Indictment (ECF No. 1) returned December 4, 2018 with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises

1

out of an arrest by an officer of the Las Vegas Metropolitan Police Department ("LVMPD") on November 22, 2018.

## II. The Parties' Positions

### A. The Motion to Suppress

Jacobs did not request an evidentiary hearing and based his motion to suppress on discovery produced by the government. On November 22, 2018 LVMPD Officer Villanueva was patrolling through the intersection of Lake Mead Boulevard and Radwick Drive when he saw a man cross Lake Mead Boulevard just west of the Lake Mead and Radwick intersection without using a crosswalk. Officer Villanueva conducted a stop of the individual, later identified as Jacobs. According to the motion to suppress, Jacobs explained that he had been recently released from the hospital and was trying to find a bus. Jacobs produced his Nevada driver's license. Another LVMPD police officer arrived at the scene to assist Villanueva. Villanueva reportedly pointed to Gonzalez stating that Gonzalez was going to pat him down for weapons, and asked if Jacobs had "anything on you we need to know about?" Jacobs responded that he had a gun in his pocket which he had found on the street. The officers then handcuffed Jacobs, retrieved a small black handgun and magazine from his pocket and booked him on charges of owning or possessing a gun by a prohibited person, carrying a concealed weapon without a permit, and buying, possessing, or receiving stolen property.

The motion to suppress argues that Officer Villanueva lacked reasonable suspicion to conduct the initial stop. None of the police reports produced in discovery identify the statute that Jacobs was purportedly violating when he crossed the street and Jacobs was not cited for any traffic offense. Defense counsel cites Nevada's jaywalking statute, NRS 484B.287, which provides that "[e]very pedestrian crossing a highway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon highway." It also provides that "[b]etween adjacent intersections at which official traffic-controlled devices are in operation, pedestrians shall not cross at any place except in a marked crosswalk." Jacobs maintains that the plain language of the statute does not prohibit crossing a street outside of a crosswalk except between adjacent intersections at which official traffic-control

2

devices are in operation. Jacobs also argues that a pedestrian may cross the street outside of a crosswalk if he yields to traffic. Because there was no operating traffic-control device across Lake Mead on either side of Radwick Drive, the officer lacked reasonable suspicion to stop Jacobs for jaywalking. Jacobs' statements and the discovery of the gun and magazine flow directly from Jacobs' illegal stop and seizure. Therefore, this evidence must be suppressed.

The motion to suppress also argues that police lacked reasonable suspicion to believe that Jacobs was armed and presently dangerous to support a lawful frisk of his person. When Officer Villanueva told Jacobs that Officer Gonzalez was going to pat him down for weapons, he had no reason to believe that Jacobs was armed or presently dangerous. Villanueva told Jacobs that he was "assuming" that Jacobs had no weapons on him because he had just been released by the hospital. Jacobs had been fully cooperative with Villanueva and produced his driver's license when asked. The bodycam of the encounter does not reveal any furtive movements or any suspicious bulges in Jacobs' clothing. Because Officer Villanueva lacked reasonable suspicion to suspect that Jacobs was armed and presently dangerous, and because Jacobs admitted that he had a gun only after the officers asserted their authority to pat him down, Jacob maintains the pat down was unlawful.

The court should suppress Jacobs' statements and the gun because Jacobs was stopped without reasonable suspicion for simply crossing the street outside of a crosswalk in an intersection where there was no adjacent traffic-control device. As Jacobs was committing no crime he should not have been detained. However, even if the initial stop was lawful, the police lacked reasonable suspicion that he was armed and dangerous to support a pat down.

**B. The Government's Response**

The government opposes the motion arguing Jacobs' Fourth Amendment Rights were not violated when he was stopped by the police. The government maintains the police had reasonable suspicion to stop Jacobs under the totality of the circumstances because Officer Villanueva's suspicions were aroused when he observed the defendant jaywalking across four lanes of traffic in the area of Lake Mead Boulevard between Radwick Drive and Hollywood Boulevard at 1:20 a.m. Jacobs did not use the designated crosswalk at Lake Mead and Hollywood, and when he saw

Officer Villanueva, Jacobs stopped in the middle of Lake Mead Boulevard next to the business district and dropped three bags he had been carrying. Officer Villanueva's observation of the defendant's activity resulted in a "person stop." The government's response maintains that Officer Villanueva had reasonable suspicion that Jacobs was jaywalking in violation of Las Vegas Municipal Code § 11.30.050.

The response argued that at a hearing Officer Villanueva would testify that defendant was not crossing "by a route at right angles to the curb or by the shortest route to the opposite curb" as the code requires. Jacobs was not crossing in a designated crosswalk or in an unmarked crosswalk and was diagonally crossing through four lanes of traffic which had no median. At an evidentiary hearing, Officer Villanueva would testify that Jacobs had an accessible crosswalk not more than 200 feet from his position and Municipal Code § 11.30.070 requires a pedestrian to use a marked crosswalk in any business district. Thus, the officer was justified in initiating contact with Jacobs. On initial contact, Jacobs told Villanueva he was part of Hope for Prisoners and had just gotten out of the hospital. Jacobs told Villanueva he was crossing the street to find a bus and kept saying "I'm going to jail, huh?" Officer Villanueva told Jacobs to relax and calm down and that he just wanted to speak to him.

According to the government's response another officer arrived at the scene and "due to the defendant's behavior Officer Villanueva told the defendant the other officer was going to do a quick pat down." Villanueva asked Jacobs if he had anything illegal on him such as weapons or narcotics. Jacobs responded: "I found a gun." The government represents that Villanueva asked where the gun was, but Jacobs did not reply despite being asked several times. Jacobs was therefore placed in handcuffs for officer safety. Jacobs stated more than one time "I just found that shit." The gun was retrieved from Jacobs' left front pocket along with a loaded magazine. Officers conducted a records' check and *Miranda* rights were reads to Jacobs. The records check reflected Jacobs was a convicted felon. Although Villanueva did not charge the defendant with jaywalking, he had probable cause to stop and issue a citation for jaywalking and was authorized to search Jacobs incident to a lawful custodial stop.

The government maintains that police had reasonable suspicion to support an investigative detention and conduct a protective pat down frisk. The Supreme Court has held that subjective intentions play no role in ordinary probable cause Fourth Amendment analysis. Even innocent non-criminal acts can support a finding of reasonable suspicion under the totality of the circumstances. Because the officers had reasonable suspicion to stop Jacobs, the weapon confiscated by police was not the fruit of the poisonous tree and the motion to suppress should be denied.

### C. Jacobs' Reply

Jacobs replies that the government bears the burden of showing his warrantless search and seizure was reasonable. The government cannot support its burden for three reasons. First, police seized Jacobs and cannot show that at the time of the seizure they had reasonable suspicion to justify the stop. Second, Jacobs was stopped in unincorporated Clark County, so the Las Vegas Municipal Code jaywalking section relied upon cannot support the stop.[1] Third, even if Jacobs was lawfully stopped, the government cannot show that the officers had a reasonable basis to believe Jacobs was armed and presently dangerous to justify the pat down or that the pat down was a valid search incident to arrest. The court must therefore suppress all evidence derived from the stop and arrest. Jacobs did not request an evidentiary hearing, nor did the government. Jacobs maintains that whether the police had reasonable suspicion to stop him and reasonable suspicion to believe he was armed and dangerous are questions of law that the court may resolve on the papers and supporting exhibits, including the body camera video leading up to the pat down.

### D. Jacobs' Supplemental Brief

Jacobs' supplement addressed the Ninth's Circuit's recent decision in *United States v Johnson*, 913 F.3d 793 (9th Cir. 2019), arguing the case "is of no import" because the police in this case lacked reasonable suspicion to stop him, let alone probable cause for an arrest. If the court finds the officers had probable cause to arrest Jacobs for some offense other than the gun Jacob maintains *Johnson* was wrongly decided. He asks that the court defer issuing its report and recommendation until after the Ninth Circuit 's ruling on a petition for rehearing *en banc*.

---

[1] The reply asked the court to take judicial notice that the stop occurred in Clark County pursuant to Fed. R. Evid. 201.

5

### III. The Evidentiary Hearing

At the evidentiary hearing, the government called LVMPD Officers Alfredo Villanueva and Andre Gonzalez.

#### A. Testimony of Officer Villanueva

Officer Villanueva testified he has been employed by LVMPD for almost two years assigned to the Northeast Area Command working graveyard. Hr'g Tr. (ECF No. 37) 8:3–13. He described the area he patrols as "pretty violent overall", especially on the northern side because of "hot spots" linked to violent crime such as robberies, homicides, and other things. *Id.* at 8:14–23.

In the early morning hours of November 22, 2018, he was on duty and had just responded to a domestic violence call prior to his encounter with Mr. Jacobs. *Id.* at 9:23–10:6. He was with Officer Andre Gonzalez on the domestic violence call. *Id.* at 10:17–20. After clearing the domestic violence call, he began driving westbound on Lake Mead from Los Feliz when he encountered Mr. Jacobs. *Id.* at 10:24–11:2. Gonzalez had just driven past Mr. Jacobs after clearing the domestic violence call. *Id.* at 11:3–5. Villanueva encountered Jacobs near a major intersection near Lake Mead and Radwick. *Id.* at 11:9-12. Jacobs was crossing the street with a bunch of bags directly in the middle of the street. *Id.* at 11:15–19. Jacobs drew Villanueva's attention because, typically people don't cross the street like that. When they see us [police officers] they back off a little bit, but Jacobs "was doing it basically almost right in front of me." *Id.* at 11:20–25. Jacobs was jaywalking or crossing the street where a crosswalk is not provided. *Id.* at 12:1–5.

An unmarked crosswalk is from one corner to the other where the sidewalk slumps down. An individual may cross in an unmarked crosswalk. *Id.* at 12:6–16. Jacobs was not crossing in an unmarked crosswalk. *Id.* at 12:17–18. There was a marked crosswalk nearby at the intersection of Lake Mead and Hollywood. *Id.* at 12:18–23. This marked crosswalk was, give or take, a quarter of a mile, maybe half of a mile from where Jacobs was crossing. *Id.* at 12:19–13:3. Jacobs was jaywalking in violation of a county misdemeanor code. *Id.* at 13:6–8.

Villanueva was presented with a copy of a portion of the LVMPD handbook each officer carries as a quick guide issuing citations or making arrests which was marked as government's Exhibit 1. The exhibit was admitted as a copy of the officer's handbook. *Id.* at 13:12–15:3.

1    Villanueva had contact with Jacobs at approximately 1:45 a.m. to 2:00 a.m. *Id.* at 15:7–10. There was still a lot of traffic on Lake Mead at that time. *Id.* at 15:11–13. Jacobs was wearing baggy clothing, a black pullover hoodie sweater, and baggy pants. *Id.* at 15:14–20. When Villanueva first saw Jacobs, he was in the middle of the street. *Id.* at 15:21–23. Villanueva activated his lights and Jacobs stopped directly in the middle of the street and just stood there. *Id.* at 15:23–16:3. Jacobs was still carrying his bags as Villanueva approached. *Id.* at 16:4–7. Jacobs began speaking saying how he was just crossing the street and just trying to find a bus. *Id.* at 16:8–12. There are bus stops in the area directly on the north side of Lake Mead where Jacobs was crossing from. *Id.* at 16:13–17. The next closest bus stop was just west of the intersection of Lake Mead and Hollywood on the south side of the street. *Id.* at 16:17–19. Jacobs was walking away from one bus stop. *Id.* at 16:20–22. Jacobs was walking on the south side of the street where there was no bus stop and walking towards an apartment complex. *Id.* at 17:2–4. Jacobs was walking near a business district. *Id.* at 17:5–14. There is no bus stop there, but one just west of the intersection at Lake Mead and Hollywood. *Id.* at 17:15–19. The intersection at Lake Mead and Hollywood is a marked crosswalk. *Id.* at 17:19–22.

Jacobs told Villanueva that he had just gotten out of the hospital and was just crossing the street. *Id.* at 17:23–18:14. Jacobs' demeanor was "standoffish" at first and he wouldn't let go of his bags when Villanueva asked him initially. *Id.* at 18:5–9. Jacobs eventually dropped his bags and provided ID. *Id.* at 18:15–21. Jacobs gave Villanueva his ID after Jacobs told Villanueva he had a firearm on him. *Id.* at 18:25– 9:2.

When asked what gave Villanueva reason to stop Jacobs, Villanueva responded that Jacobs was in a high crime area near two apartment complexes not far from where he was stopped where there are a lot of violent domestic violence claims usually with weapons involved. *Id.* at 19:7–12. There is an area just east of the location which is a secluded desert area where a lot of guys go and shoot their firearms in the air. *Id.* at 19:12–16. Jacobs' behavior, the area where he was stopped and discussion with Jacobs led Villanueva to determine he needed to pat Jacobs down. *Id.* at 19:20–23. Villanueva asked Jacobs if he had anything on him that Villanueva should know about such as firearms or narcotics as Officer Gonzalez was just arriving to assist. *Id.* at 19:24–20:4. When

7

1  Officer Gonzalez pulled up to the stop, Villanueva told Jacobs that Gonzalez was going to pat him
2  down for weapons. *Id.* at 20:5–10. Villanueva asked Jacobs if he had anything illegal on him such
3  as firearms or narcotics or anything that was going to hurt Villanueva and Jacobs responded, "I
4  found a gun." *Id.* at 20:15–23. At this point, Villanueva took Jacobs into custody by placing him
5  in handcuffs and conducting a pat down. *Id.* at 20:25–21:3. Villanueva found a weapon in Jacobs'
6  left pants pocket that was not loaded. *Id.* at 21:4–9.

7  Jaywalking is an arrestable offense under the county code. *Id.* at 21:11–13. Officers have
8  discretion to make an arrests or issue citations or warnings for jaywalking. *Id.* at 21:14–23.

9  When the firearm was found, Jacobs told Villanueva he had found it in a nearby bush
10  directly east of the bus stop he was coming from. *Id.* at 22:2–10.

11  On cross-examination, Villanueva testified that the area he patrols is an approximately 10-
12  15 square mile area. *Id.* at 23:3–7. It is a high crime area. *Id.* at 23:9–10. The nearest intersection
13  to the east of Radwick is Los Feliz. *Id.* at 23:16-18. The nearest intersection to the west of
14  Radwick is North Hollywood. *Id.* at 23:22–24. At North Hollywood there is a traffic light and
15  crosswalk. *Id.* at 23:24–24:3. There is no traffic light and no crosswalk at Radwick and Lake
16  Mead. *Id.* at 24:4–8. There is no light or crosswalk at the intersection further east at Los Feliz.
17  *Id.* at 24:9–13. The Mountainside Apartments are north of Lake Mead. *Id.* at 25:19–23. The Avion
18  Apartment Complex is on the south side of Lake Mead. *Id.* at 25:24–26:3.

19  Officer Villanueva wrote in his report that the stop occurred at 1:20 a.m. *Id.* at 26:11–13.
20  His report did not state this was a high crime area. *Id.* at 26:14–17. Officer Villanueva testified
21  on direct that Jacobs stopped in the middle of the street but did not include this in his report. *Id.*
22  at 27:13–19. Villanueva did not put in his report that Jacobs was wearing noticeably baggy
23  clothing. *Id.* at 28:9–13.

24  Villanueva was wearing a body camera on November 22nd pursuant to department policy.
25  *Id.* at 28:17–21. Portions of the audio and video recording were played at the evidentiary hearing.
26  There is a 30-second delay from the time an officer presses the button to start the video until sound
27  is heard. *Id.* at 29:14–21. Officer Villanueva's bodycam video was marked and admitted as
28  defense Exhibit F. *Id.* at 30:11–17.

Jacobs opened his wallet and Villanueva was able to grab his ID from it. *Id.* at 30:21–25. This was before Jacobs mentioned anything about a gun. *Id.* at 31:1–3. Villanueva told Jacobs he was going to pat Jacobs down before Jacobs mentioned anything about a gun. *Id.* at 31:4–6. Villanueva did not tell Jacobs he could say no to a pat down. *Id.* at 31:7–9. *Miranda* rights had not been administered and permission to conduct a pat down was not requested. *Id.* at 31:7–13. Rather, Villanueva told Jacobs his partner was going to pat Jacobs down. *Id.* at 31:14–15. Both officers were in uniform with weapons visible. *Id.* at 31:19–32:3. Before Jacobs said he had a gun, Jacobs was being investigated for jaywalking. *Id.* at 32:7–9. To Villanueva, that means crossing the street where there is no crosswalk. *Id.* at 32:10–12.

Villanueva asked Jacobs questions on the roadside after the gun was found. *Id.* at 33:23–25. Defense Exhibit E was marked and admitted as the video taken shortly after the gun was discovered. *Id.* at 34:1–10. Villanueva asked Jacobs where he was from and why he was crossing the street like that. *Id.* at 34:16–20. Defense Exhibit D was marked and admitted; it is a video of the trip to CCDC with Jacobs in Villanueva's car. *Id.* at 35:3–16.

On re-direct examination, Villanueva testified that there was an unmarked crosswalk at Radwick and Lake Mead. *Id.* at 37:3–9. If Jacobs had been crossing at that unmarked crosswalk, Villanueva would not have had grounds for an arrest. *Id.* at 37:10–13. During the pat down after Jacobs said he had a firearm on him, Jacobs stopped talking to Villanueva. *Id.* at 37:24–25.

The court inquired what, if any, reason Villanueva had to believe at the time he announced Officer Gonzalez was going to pat Jacobs down that Jacobs was armed and dangerous. Villanueva responded that Jacobs had a bunch of bags on him and had pockets and baggy clothing. *Id.* at 38:11–17. Villanueva knew based on his training and experience that people can carry concealed weapons or things that might harm an officer in their bags or on their person. *Id.* at 38:18–22. When the court asked what, if any, reason Villanueva had to believe at the time that he announced that Officer Gonzalez was going to pat Jacobs down that Jacobs was presently armed and dangerous, Jacobs responded "there was something off about him," Jacobs "kept kinda bouncing around . . . by trying to avoid my questions . . . so I figured something was up." *Id.* at 38:23–39:7. When the court asked, "did you have anything more than a hunch that he might be armed or

9

dangerous," Officer Villanueva testified, "no I did not." *Id.* at 39:11–13.

### B. Testimony of Officer Gonzalez

Officer Gonzales has been employed by LVMPD for nearly two years. *Id.* at 40:11–14. He was assigned to Northeast Area Command on the graveyard shift. *Id.* at 41:2–4. On November 22nd, he and Officer Villanueva were both patrolling and had just responded to a domestic violence call in the area immediately before the encounter with Mr. Jacobs. *Id.* at 41:5–15. The area is a high crime rough area. *Id.* at 41:16–42:4.

When Gonzalez arrived, Jacobs was in front of Officer Villanueva's car. *Id.* at 42:17–23. Gonzalez recognized Jacobs as an individual he had passed after clearing the earlier domestic violence call. *Id.* at 43:4–13. When Gonzalez first saw Jacobs, he concluded that it looked like Jacobs was going to jaywalk, saw Gonzalez, and then continued walking, so Gonzalez drove on. *Id.* at 43:13–15. There was no crosswalk where Villanueva had stopped Jacobs. *Id.* at 43:23–25. There was no unmarked crosswalk where Mr. Jacobs was stopped. *Id.* at 44:1–3.

On cross-examination, Officer Gonzalez testified that he typically rides alone in this area. *Id.* at 44:12–16. When Gonzalez saw Jacobs earlier, he was just walking on the sidewalk. *Id.* at 44:19–23. It was 1:30 a.m.; Jacobs wasn't doing anything wrong, looked back towards Gonzalez, and continued about his business. *Id.* at 44:24–45:2. Portions of the bodycam previously admitted as defense Exhibit F were played. Officer Gonzalez recognized himself in the bottom right-hand corner of the screen. *Id.* at 46:1–9. Gonzalez searched Jacobs' bags—two backpacks and a laptop case. *Id.* at 46:18–24. Gonzalez did not find any weapons, drugs, or anything of evidentiary value in the bags. *Id.* at 46:25–47:5.

On re-direct, Officer Gonzalez testified he was following the direction of his partner in conducting a pat down search. *Id.* at 47:10–12.

Gonzalez testified in response to a question posed by the court that at the time he searched Jacobs at Villanueva's direction Gonzalez had nothing more than a hunch that Jacobs might be armed or dangerous. *Id.* at 47:13–17. Gonzalez also testified that he did not have reasonable and articulable circumstances to believe that Mr. Jacobs was armed or dangerous before being directed by his partner to conduct a pat down. *Id.* at 47:18–22.

The government rested and defense counsel indicated that the defense did not have any testimony or evidence to admit. The court canvassed Mr. Jacobs who stated he was satisfied with the representation of counsel to date and acknowledged that he had discussed the matter with his counsel, was aware he had the right to testify or not at the evidentiary hearing and had decided not to do so. *Id.* at 48:2–49:5.

**C. Oral Argument**

At the conclusion of the evidentiary hearing, counsel for Jacobs stated that she expected the government might assert a mistake of law argument. If so, the court must decide whether the officer's mistake was reasonable and that the stop was lawful based on probable cause. NRS 484B.287 requires a pedestrian crossing a highway at any point other than within a marked crosswalk or an unmarked crosswalk to yield to the right-of-way to all vehicles on the highway. The state statute makes clear that one can cross a highway not at a marked or unmarked crosswalk if one yields to vehicles. There is no evidence that Jacobs did not do that. Another subsection of the state statute addressed in the motion to suppress governs crossing between adjacent intersections at which official traffic control devices are in operation. The state statute provides that one may not cross at any place except within a marked crosswalk between adjacent intersections. However, the officers' testimony was that the nearest intersection to Jacobs' left was Hollywood and Lake Mead where there is a light. The nearest intersection to Jacobs' right or to the east was at Radwick and Lake Mead. There are no lights or marked crosswalks there. Therefore, Jacobs was not between adjacent intersections at which traffic control devices are in operation and Jacobs was plainly allowed to cross the street.

Counsel for Jacobs argued that the question was whether Officer Villanueva's mistake of law was reasonable. She stated that it was clear that Villanueva was legitimately and sincerely mistaken about his belief that a person crossing the street, not in a marked crosswalk or an unmarked crosswalk, was jaywalking. His department-issued roadside handbook seems to suggest this. However, in *Heinen v. North Carolina*, the court held that the Fourth Amendment tolerates only reasonable mistakes which must be objectively reasonable not the subjective understanding of the officer.

Although Officer Villanueva cited the county code in his testimony as the jaywalking ordinance he was referring to, the government's response to the motion to suppress cited the city code. Counsel for Jacobs maintained that the county code mirrors the state's statute. It is undisputed that Jacobs was in the county, not the city of Las Vegas; thus, Officer Villanueva's mistake of law was not objectively reasonable, and the court need not address the Ninth Circuit's *Untied States v. Johnson* decision. If the officer did not have probable cause to arrest for jaywalking, whether under the Nevada state statute. the county code, or the municipal code, the search incident to arrest exception does not apply.

Counsel for the government argued that Officer Villanueva testified he was relying on the county ordinance governing jaywalking which is the same as the city ordinance. The ordinance states that crossing somewhere other than a crosswalk is jaywalking. The government conceded that there was no evidence that Jacobs failed to yield the right-of-way to a vehicle crossing the street so that this subsection of the county ordinance would not apply. However, Officer Villanueva testified that Jacobs crossed a roadway between intersections in a place other than a crosswalk. There was a marked crosswalk at Hollywood and Lake Mead. Radwick was an unmarked crosswalk where Jacobs could have crossed lawfully but did not do so. The testimony was that Jacobs crossed from sidewalk to sidewalk rather than in an unmarked crosswalk. This gave Villanueva probable cause to either cite, warn, or arrest. Based on probable cause that Jacobs was jaywalking Villanueva could lawfully search Jacobs incident to his arrest; therefore, the pat down was lawful. The government conceded that the validity of the search of Jacobs' person which recovered the gun depended upon whether the officer had probable cause to make an arrest for jaywalking.

In rebuttal, counsel for Jacobs indicated she had just looked up the county code and it did not mirror the city code.

Both parties stipulated that the court could review the county code to decide whether the officers' testimony supported probable cause for an arrest for jaywalking under the county code.

/ / /

/ / /

**DISCUSSION**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 350–51 (1967). The Fourth Amendment protects "people, not places." *Id.* at 351. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing *Wong Sun*, 371 U.S. at 484–87).

Jacobs was stopped while walking and crossing the street and subjected to a warrantless pat down search of his person and search of his bags. The government claims Officer Villanueva had reasonable suspicion to conduct an investigatory detention for jaywalking and probable cause to make an arrest. Jacobs was arrested on state felony charges of possession of a firearm by a prohibited person, possession of a stolen firearm, and a gross misdemeanor offense of carrying a concealed weapon based on evidence recovered from Jacobs' pants pocket following his jaywalking stop and pat down search. *See* Declaration of Arrest attached as Exhibit C to the motion to suppress.

After the officers' testimony at the evidentiary hearing, the government conceded that the officers lacked reasonable suspicion to believe that Jacobs was armed and dangerous at the time the decision was made to conduct a pat down. However, the government maintains that because Officer Villanueva had probable cause to arrest Jacobs, the pat down was justified under the search incident to a lawful arrest exception to the warrant requirement.

The stop was unquestionably a seizure. For Fourth Amendment purposes, a seizure of a person occurs when law enforcement in some way restricts the liberty of a citizen, either by physical force or show of authority. *Florida v. Bostick*, 501 U.S. 429, 434 (1981). It is undisputed

that this was not a consensual encounter and that Villanueva detained Jacobs during an investigatory detention for jaywalking. An investigatory detention is a brief seizure by police based on reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 26 (1968). It is a "narrowly drawn exception to the probable cause requirement of the Fourth Amendment." *Id.* Courts look at the totality of the circumstances on a case by case basis to determine whether the detaining officer had a "particularized and objective basis" for suspecting a crime has been committed. *United States v Arvizu*, 534 U.S. 266, 272 (2002). Observations of factors that by themselves may be consistent with innocence may collectively amount to reasonable suspicion. *Id* at 273. Officers may rely on their training and experience to make inferences and draw deductions from the facts known to them that "might well elude an untrained person." *Id.* at 274.

It is undisputed that during the detention Villanueva asked for and obtained Jacobs' identification, decided to pat Jacobs down, and asked Jacobs whether he had anything on him such as narcotics, weapons, or anything that might hurt the officers. Jacobs responded that he had a gun that he had just found. Jacobs was not asked for consent to conduct a pat down and it is undisputed that he merely acquiesced to Officer Villanueva's announcement that he was going to be frisked. A pat down for weapons must be supported by reasonable suspicion to believe that an individual is armed. *United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006) (collecting cases). A variety of factors may support reasonable belief that an individual is armed. *Id.* However, as the Ninth Circuit explained in *Flatter*, to comport with the Fourth Amendment, police must have more than a belief that *if* the individual with whom they had contact was armed he may be dangerous. *Id*. It is clear the officers lacked reasonable suspicion to believe that Jacobs was armed or dangerous when the decision was made to pat him down. Villanueva testified that Jacobs was wearing baggy clothing and carrying three bags at the time he was stopped. Villanueva knew, based on his training and experience, a person could conceal a firearm in baggy clothing and in bags, but acknowledged he had nothing more than a hunch Jacobs was armed. However, if the officers had probable cause to arrest Jacobs for an offense the pat down which recovered the gun was lawful under the search incident to arrest exception to the warrant requirement.

The search incident to a lawful arrest exception to the warrant requirement allows a police

14

officer to search a person arrested and the area within the arrestee's immediate control. *Arizona v. Gant*, 556 U.S. 32, 339 (2009). The Supreme Court has held that a search incident to a lawful arrest does not necessarily need to follow the arrest to comport with the Fourth Amendment. *Rawlings v Kentucky*, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."). It is uncontroverted that before the pat down occurred, Jacobs told the officers he had a gun in his pocket that he had just found. Jacobs was arrested for carrying a concealed weapon, possession of a firearm by a prohibited person, and possession of a stolen firearm after the firearm and magazine were recovered from his pants pocket, and after a records check indicated Jacobs had six Nevada felony convictions

In *United States v Johnson*, 913 F.3d 793 (9th Cir. 2019), the Ninth Circuit recently reaffirmed that (1) a search incident to an arrest does not necessarily need to follow the arrest to comport with the Fourth Amendment and (2) and an officer's subjective reasons for making the arrest need not be the criminal offense for which the officer had probable cause to arrest. Neither of these holdings established new law. *Id.* at 799. Both holdings are consistent with long-established Supreme Court and Ninth Circuit precedent. The *Johnson* decision merely addressed and rejected the defendant's argument that allowing a search incident to an arrest for a criminal offense other than the criminal offense for which probable cause existed would invite pretextual and discriminatory searches. The Ninth Circuit held that these two well established principles may coincide together without violating the Fourth Amendment.

The Ninth Circuit reasoned that the justification for the search incident arrest exception to the warrant requirement is "based upon the need to disarm and to discover evidence," and does not depend on what a court may later decide was "the probability in a particular arrest situation that weapons or evidence would, in fact, be found upon the person of the suspect." *Id.* at 800 (citing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). Under established Fourth Amendment jurisprudence, if probable cause to arrest exists at the time of the search, and the arrest occurs during a continuous sequence of events, "the fact that the arrest occurred shortly after the search does not affect the search's legality." *Id.* at 799. When the facts known to the officer provide

probable cause for an arrest for an offense, the officer's "subjective reasons for making the arrest need not be the offense as to which the known facts provide probable cause." *Id.* (quoting *Devenpack v. Alford*, 543 U.S.146, 153 (2004)).

The court finds that Officer Villanueva had reasonable suspicion to stop Jacobs for jaywalking, and probable cause to arrest for jaywalking. During the limited and lawful investigatory detention Villanueva developed probable cause to arrest Jacobs for carrying a concealed weapon and possession of a firearm by a prohibited person, and possession of a stolen firearm.

Villanueva's report did not cite the statute or ordinance under which the stop was made. Defense counsel's motion to suppress assumed the Nevada state jaywalking statute NRS 484B.287 was the applicable jaywalking statute.[2] The state statute applies to jaywalking on state highways. After the evidentiary hearing counsel for Jacobs initially argued that her client had not violated that the state statute, but then conceded the country ordinance applied, which she believed was very similar.

The government's response to the motion to suppress assumed the stop occurred in the City of Las Vegas, and that the city code jaywalking provision, § 11.30.060, applied. The city code is

---

[2] NRS 484B.287 provides:

**When pedestrian must yield right-of way to vehicle; when crossing at crosswalk is required; crossing diagonally; additional penalty if violation occurs in pedestrian safety zone**.
(1) Except as provided in NRS 484B.290:
   a. Every pedestrian crossing a highway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon highway.
   b. Any pedestrian crossing a highway at point where a pedestrian tunnel or overhead pedestrian crossing has been provided shall yield the right-of-way to all vehicles upon the highway.
   c. Between adjacent intersections at which official traffic-control devices are in operation, pedestrian shall not cross at any place except in a marked crosswalk.
   d. A pedestrian shall not cross an intersection diagonally unless authorized by official traffic control devices.
   e. When authorized to cross diagonally, pedestrians shall cross only in accordance with the official traffic-control devices pertaining to such crossing movements.
(2) A person who violates any provision of this section may be subjected to the additional penalty set forth in NRS 484B.135.

The exception in NRS 484B.290 applies to the right-of-way for a blind person.

similar, but not identical, to the county code. It provides:

   Crossing outside crosswalk:

- (A) Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.
- (B) Any pedestrian crossing a roadway at a point where a pedestrian tunnel or overhead pedestrian crossing has been provided shall yield the right-of-way to all vehicles upon the roadway.
- (C) The foregoing rules in this section shall have no application under the conditions stated in § 11.30.070 when pedestrians are prohibited from crossing at certain designated places.

Section 11.30.070 is a Las Vegas code provision regarding crosswalk use. It provides:

- (A) Between adjacent intersections at which traffic-controlled signals are in operation, pedestrian shall not cross at any place except in a crosswalk.
- (B) No pedestrian shall cross a roadway other than within an unmarked crosswalk in a central traffic district or in any business district.

Jacobs' reply asked the court to take judicial notice that the stop occurred in unincorporated Clark County. Officer Jacobs testified the stop occurred in Clark County and that Jacobs was stopped under the County ordinance, 14:36.030. The court finds the stop occurred in the county; therefore, the county jaywalking ordinance applies. It provides:

Crossing at other than crosswalks.
- (a) Pedestrian to Yield. Every pedestrian crossing at a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.
- (b) Tunnel or Overpass. Any pedestrian crossing a roadway at a point where a pedestrian tunnel or overhead pedestrian crossing has been provided shall yield the right-of-way to all vehicles upon the roadway.
- (c) Between Intersections. Between adjacent intersections at which traffic-control signals are in operation, pedestrian shall not cross at any place except in a marked crosswalk.

Clark County Code of Ordinances Title 14, Section 14.36.030.

Jacobs maintains that he could not be detained or arrested for jaywalking because he was not violating the applicable county code by crossing in the middle of the street because officer Villanueva did not claim he failed to yield the right of way to any vehicles on the roadway. Jacobs contends that because the initial stop was not supported by reasonable suspicion his statements and the gun and magazine must be suppressed under the fruit of the poisonous tree doctrine. He

1 reasons that because there was no traffic control device at the closest intersection to the east at
2 Lake Mead and Los Feliz or the nearest intersection to the west at Lake Mead and North
3 Hollywood, crossing Lake Mead in the middle of the street did not violate the jaywalking statute.
4 The court disagrees.

5       Neither side cited any Nevada case construing the county jaywalking ordinance, or the
6 similar state statute or city code. During the evidentiary hearing a page of the LVMPD handbook
7 citing the county ordinance section, city ordinance section, and NRS state statute for jaywalking
8 was admitted as government's Exhibit 1. The exhibit merely provides the citation for both
9 ordinances and the statute as well as the county booking code pertaining to jaywalking violations.
10 It provides guidance to officers about how to write a citation for jaywalking under two different
11 circumstances. The handbook instructs officers that they can cite for jaywalking because a person:
12 "did fail to yield the right-of-way to a motor vehicle while crossing the roadway; or because a
13 person "did cross a roadway between intersections in a place other than a crosswalk." The page
14 from the handbook is merely a tool for officers to use in the filed for writing citations; however, it
15 illustrates how officers are trained to identify a violation.

16       Here, it is clear from the testimony of Officer Villanueva that he stopped Jacobs for
17 jaywalking under Subsection (c) of the county ordinance for crossing in a place other than in a
18 marked crosswalk between adjacent intersections at which traffic-control signals are in operation.
19 Although Jacobs is correct that there were no traffic control devices at the nearest adjacent
20 intersections to the east or to the west of where Jacobs was stopped, Officer Villanueva testified
21 that there was a marked crosswalk nearby at the intersection of Lake Mead and Hollywood, a
22 quarter to a half mile from where Jacobs was crossing. It is uncontroverted that Jacobs was
23 crossing in the middle of the street across Lake Mead in a place other than in a marked crosswalk.

24       Officer Villanueva had reasonable suspicion to conduct the initial stop for jaywalking.
25 Jaywalking is an arrestable offense. During the investigatory detention, Villanueva developed
26 probable cause to arrest Jacob for carrying a concealed weapon, possession of a firearm by a
27 prohibited person and possession of a stolen firearm. Although the pat down that recovered the
28 firearm and magazine occurred before the formal arrest, and the crimes for which Jacobs was

arrested were different from the crime that resulted in the initial stop, under well-established Supreme Court and Ninth Circuit precedent, it was a lawful search incident to arrest. *Johnson*, 913 F.3d at 800 ("We therefore join our sister circuits in holding that *Knowles* does not prevent a search incident to a lawful arrest from occurring before the arrest itself, even if the crime of arrest is different from the crime for which probable cause existed.") (citing *United States v. Diaz*, 854 F.3d 197, 206–07 (2d Cir. 2017); *United States v. Coleman*, 458 F.3d 453, 458 (6th Cir. 2006); *United States v. Sanchez*, 555 F.3d 910, 921–22 (10th Cir. 2009)).

**IT IS RECOMMENDED** that Jacobs' Motion to Suppress (ECF No. 21) be **DENIED**.

DATED this 22nd day of March 2019.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE